UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JULIA P.,

                         Plaintiff,

        -against-                                    6:19-CV-01171 (LEK)

ANDREW SAUL, Commissioner of the
Social Security Administration,

                         Defendant.

_____

**MEMORANDUM-DECISION AND ORDER**

**I.     INTRODUCTION**

        This Social Security appeal is before the Court following an August 21, 2019 decision

of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff Julia

Parker's application for Disability Insurance Benefits ("DIB"). See Dkt. No. 8 ("Record") at

1–4, 10–23.[1] Both parties have filed briefs. Dkt. Nos. 13 ("Plaintiff's Brief"); 19 ("Defendant's

Brief"). For the reasons that follow, the Court remands this action for further proceedings

consistent with this Memorandum-Decision and Order.

**II.    BACKGROUND**

        **A.  Regulatory Framework**

        In SSA regulations, a disability is defined as "the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 20 C.F.R. § 404.1505(a). For purposes of an application for DIB,

_____

        [1]  The administrative record has been filed as a series of exhibits rather than a single
document. For simplicity, the Court cites to the Record as if it is a single uploaded document.

there is a five-step sequential evaluation process for determining whether an individual is

"disabled":

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity ["RFC"] to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

Andrew S. v. Saul, No. 19-CV-570, 2020 WL 6709833, at *1 (N.D.N.Y. Nov. 16, 2020) (Kahn,

J.) (alterations omitted); 20 C.F.R. §§ 404.1520, 416.920. The ultimate "burden is on the

claimant to prove that he is disabled." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000). But if

the claimant meets her burden with respect to the first four steps, the burden shifts to the

Commissioner to prove in the fifth step that the claimant has the RFC to perform substantial

gainful work existing in the national economy. See Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

1996).

### B.  Factual and Medical Background

Parker was 45 years old on the application date and 49 years old at the time that her

insured status lapsed on December 31, 2017. See Pl.'s Br. at 4. Parker has a high-school

education, and her past relevant work consists of employment as a bartender. See id.; R. at 23.

In describing Parker's health, the Court focuses on aspects of her physical condition that are relevant to this appeal.

Plaintiff alleges disability due to, among other physical ailments, cervical disc injuries, radiculopathy,[2] and psoriatic arthritis. See Pl.'s Br. at 5. Leading up to a May 26, 2016 spinal surgery, Parker had "long-standing cervical pain which was exacerbated by the movement of her head." R. at 1241. She experienced "sharp pains which radiated into both [arms,] right greater than left[,] and . . . intermittent weakness in her [legs]." Id. On March 31, 2016, Dr. Ramsi Kairallah diagnosed Parker with "spinal stenosis, cervical region." Id. at 1220. On April 20, 2016, Dr. Ross Moquin examined Parker and "reviewed results of a cervical MRI that showed significant changes throughout the cervical spine, including disc bulges and osteophytic formations at C4-5, C5-6, and C6-7." Id. at 14; see also id. at 1007. Dr. Moquin diagnosed Parker with "cervicalgia, spinal stenosis, cervical region and cervical disc disorder with radiculopathy." Id. at 14; see also id. at 1007.

On May 26, 2016, she underwent a surgical procedure on cervical discs C4-C7. More precisely, Dr. Moquin performed a "C4 to C7 anterior cervical discectomy and fusion."[3] Id. at 14, 1247. In the course of this procedure, Dr. Moquin inserted biomechanical devices between vertebrae and applied a synthetic bone void filler. See Pl.'s Br. at 4–5. As discussed more fully

---

[2]  Radiculopathy is a disorder of the spinal nerve roots. See *Radiculopathy*, Stedmans Medical Dictionary 748650 (2014).

[3]  A discectomy is a procedure by which an intervertebral disk is removed. See *Discectomy*, Stedmans Medical Dictionary 252070 (2014). Spinal fusion involves connecting vertebrae. See *Spinal fusion*, Stedmans Medical Dictionary 358540 (2014).

below, many of the central factual disputes in this case concern the physical consequences of

this procedure for Parker. Parker alleges that she experienced chronic post-surgical pain in her

skull, spine, shoulders, fingers and hands; numbness and weakness in her hands; and

restrictions in the range of motion in her neck, both up and down and left to right. See Pl.'s Br.

at 6–7, 15.

### C. Procedural History

The Court focuses its summary of the procedural history on aspects of prior

administrative hearings and decisions that are relevant to this appeal.

On May 14, 2014, Parker filed an application for DIB under Title II of the Social

Security Act, alleging an onset date of June 12, 2013. Pl.'s Br. at 2. Parker's claim was initially

denied on August 8, 2014. Id. A hearing was held before an Administrative Law Judge ("ALJ"),

Barry E. Ryan, on March 29, 2016. See R. at 63–96. The ALJ operated under the mistaken

assumption that Parker's last date insured was June 30, 2016. See id. at 65. Parker testified at

the hearing that she experienced chronic pain in her neck and spine, which she attributed to

lupus, and that she suffered from psoriatic arthritis, which caused pain in her hands. See id. at

84–88. She also reported that, "as of recently," she had "neurological damage caused from

rheumatoid arthritis and from osteoporosis in my neck where it is attacking the discs between

the vertebras of C1 through C5, and may . . .need operation." Id. at 76. The ALJ issued an

unfavorable decision on January 13, 2017, in which he found only one severe impairment,

systemic lupus erythamatosus. See Pl.'s Br. at 2, 5.

On December 27, 2017, the Appeals Council vacated and remanded that decision,

noting that the ALJ's decision omitted analysis of certain recent events in Parker's medical

history:

> The decision found that the claimant's date last insured was June 30, 2016. The decision also found that the claimant was not disabled at any time from June 12, 2013, the alleged onset date, through June 30, 2016. The Appeals Council notes that the claimant's date last insured is December 31, 2017. This information was available at the time of the hearing. Therefore, there is an unadjudicated period from July 1, 2016 through the January 13, 2017 decision date. As a result, consideration should be given to whether the claimant was under a disability during the unadjudicated period.
>
> The record shows the claimant underwent a C4-C7 anterior arthrodesis; a C4-05, C6-C7 complete discectomy with resection of osteophytes anteriorly and posteriorly, 3 levels; placement of biomechanical interbody devices C4-05, C5-C6 and C6-C7, 3 levels; placement of anterior place C4-C7; and preparation and placement of allograft Actifuse ceramic synthetic bone product on May 26, 2016. This surgery came after the claimant underwent non-operative treatment. The decision does not discuss this procedure or whether the claimant's cervical disc disorder with radiculopathy constitutes an additional severe impairment.

Id. at 3 (citations omitted). In ordering a new hearing, the Appeals Council gave the ALJ the following instructions:

> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the severity of the claimant's cervical disc disorder.
>
> If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.

Id.[4]

---

[4] The Record does not include either the January 13, 2017 ALJ decision or the December 27, 2017 Appeals Council decision. The Commissioner concedes that Plaintiff's account of the procedural history is accurate in its entirety. See Def.'s Br. at 2.

On September 4, 2018, a second hearing was held before an ALJ, Elizabeth W. Koennecke. See R. at 97–131. On October 12, 2018, the ALJ issued a decision finding that Parker was not disabled from June 12, 2013 until December 31, 2017, the last date insured. See id. at 10–23.

At the hearing, Parker testified as follows regarding the limiting effects of her physical impairments. After her surgery, she endured a four-month period of recovery, from May to August, during which she wore a "C collar." See id. at 107. Between her surgery and the date of the hearing, she had physical limitations affecting her ability to use the bathroom, dress herself, shower, and prepare food. See id. at 108. During this period, she wore diapers and had a bedside commode that her husband emptied every night after he returned home from work. See id. Her husband dressed her. See id. He also helped her shower, as she was unable to reach her back, under her arms, her feet, or her leg below the knee. See id. at 109. He also woke up early every morning to prepare her breakfast and lunch, which he would leave in a cooler on the bedside table next to her bed. See id. at 108.

Parker also testified to having limited mobility in her neck during this period. She could not "turn [her] head like normal people do," but rather had to "turn [her] whole waist to . . . turn around to look at something. Id. at 109. She also experienced "constant sharp pains from [her] neck that sho[]t down [her] spine," and traveled into her shoulders, arms, and hands as often as five times per day, for one to two hours in each instance. See id. She had difficulty looking downward. See id. at 113. For instance, when she was eating, she had to push her plate six or seven inches forward on the table in order to see her food. See id.

She additionally detailed limitations in her ability to walk and sit. See id. at 110–11. She

recounted that it hurt when she walked, that she had to use a cane for stability, and that she frequently fell. See id. at 110. She could only sit ten to fifteen minutes at a time, after which she would need to stand and stretch. See id. She attributed these limitations to stiffness and sharp pain in her neck. See id. at 111. She stated that when she used stairs, she had to hold the railing, surmount one step at a time, putting both feet on each step, and take a short break after each step or two. See id. at 113.

She also described difficulty lifting and using her hands. See id. at 111–14. She could not lift a gallon of milk to pour milk into a glass. See id. at 111. She had trouble holding on to a drinking class, and thus used lighter plastic Solo cups to drink. See id. She ate off of paper plates because she could not hold or lift an ordinary plate. See id. She was unable to cut meat, because it hurt her wrists and fingers, and because she had trouble making a grip. See id. at 111–12. She used a geriatric toothbrush, which had a rubber sleeve on the handle to enable her to grip the toothbrush. See id. at 112. She also was unable to do laundry, due to limitations in her ability to lift, and unable to wash to dishes, due to resulting pain in her back, shoulders, and neck. See id. at 112–13. She has a stronger grip with her left than her right hand. See id. at 114.

Prior to the September 2018 hearing—in May 2016, to be precise—the ALJ obtained opinions from two non-examining medical experts, Dr. Louis A. Fuchs and Dr. Anne E. Winkler, regarding Parker's ability to perform work-related activities. See id. at 972–94. In assessing Parker's physical limitations in the context of RFC analysis, the ALJ relied on those two opinions, the July 2014 opinion of consultative examiner Dr. Kautilya Puri, and the ALJ's own review of Parker's medical records post-dating these three expert opinions. See id. at 16–21.

At step two of the sequential analysis, the ALJ found that Parker had the following severe impairments: obesity, psoriatic arthritis, and "a neck impairment." See id. at 13–14. With respect to "a neck impairment," the ALJ noted the following:

> During the office visit with PA Slavich in March 2016, the claimant was assessed with spinal stenosis, cervical region. Ross Moquin, MD examined the claimant on April 20, 2016 and reviewed results of a cervical MRI that showed significant changes throughout the cervical spine, and specifically disc bulges and osteophytic formations at C4-5, C5-6, and C6-7. The radiologist indicated significant diminution of the CSF space around the spinal cord and distortion of the spinal cord and exiting nerve roots. Dr. Moquin assessed the claimant with cervicalgia, spinal stenosis, cervical region and cervical disc disorder with radiculopathy.
>
> On May 26, 2016, Dr. Moquin performed a C4 to C7 anterior cervical discectomy and fusion. The claimant reported to PA Slavich on January 26, 2017 that she has thirty percent loss of range of motion in her neck since her surgery. Overall, she probably has less pain than she had prior to the surgery.

Id. at 14 (citations omitted). The ALJ further noted that treatment records from throughout 2015 and 2016 documented symptoms of psoriatic arthritis. See id. at 16. The ALJ recognized that on March 2, 2015, Parker was treated by Dr. Kairallah for this condition, and that in a March 31, 2016 appointment, Dr. Kairallah diagnosed her with "other psoriatic arthropathy" and "other psoriasis" and prescribed methylprednisolone. See id. at 14, 1073–81, 1220. The ALJ also decided that, while Parker's medical records indicated that she had been "diagnosed . . . with possible lupus" at some point before 2013 and began treatment for lupus in 2013, a diagnosis of lupus had been ruled out in 2017. See id. at 15–16. The ALJ found that none of Parker's severe impairments met or medically equaled the severity of one of the impairments listed in Appendix 1of the regulations. See id. at 16.

8

The ALJ determined that, notwithstanding her severe impairments, Parker had the RFC to perform "sedentary work," as defined in 20 C.F.R. 414.1567(a), "except that" she could "occasionally lift and carry ten pounds," "frequently lift and carry less than ten pounds," "sit for eight hours total during an eight-hour work day," "stand and work for four hours total . . . during an eight-hour workday," "frequently balance, occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl," and "never climb ladders or scaffolds." See id. at 16.[5]

In reaching this conclusion, the ALJ assessed Parker's symptoms pursuant to 20 C.F.R. § 404.1529 and SSR No. 16-3p. See id. at 16. In assessing symptoms in the context of RFC analysis, an ALJ is to use a two-step process. First, the ALJ must determine whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce an individual's symptoms[.]" SSR No. 16-3p, 2016 SSR LEXIS 4 at *3. Second, the "intensity and persistence of those symptoms" are examined "to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." Id.; 20 C.F.R. § 404.1529. In the second step, the ALJ is to consider "all of the available evidence," § 404.1529(a), which includes "information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [SSA] employees and other persons," §

---

[5] "Sedentary work" entails "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. 414.1567(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Id. "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 SSR LEXIS 30, at *13.

404.1529(c)(3). Other relevant factors include the claimant's daily activities; the "location, duration, frequency, and intensity of [the claimant's]. . . symptoms"; treatments and measures used to alleviate the symptoms; "[p]recipitating and aggravating factors"; and the effectiveness of medications. Id.

The ALJ found that while Parker's physical impairments could be "reasonably expected to produce" her alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." See R. at 20.

In reaching this conclusion, the ALJ relied on the following evidence. First, the ALJ noted Dr. Puri's July 2014 opinion. See id. at 18–19. In this opinion, Dr. Puri found subsequent to an examination that Parker did not have any objective limitations with respect to fine or gross motor activity. See id. at 19, 520. He found that she did not have any limitations of motion throughout her cervical or lumbar spine. See id. at 19, 520. He also noted that she had no muscle atrophy or sensory deficits and that she demonstrated full strength in her arms and legs. See id. 19, 520. He found, however, that she had positive trigger points[6] affecting her neck, shoulders, back, and ribs, and tenderness on palpation[7] and with movement of her knees, hips, shoulders, and back. See id. at 19, 519–20. The ALJ gave "some weight" to this evidence, because "Dr. Puri [is] a program knowledgeable expert who examined the claimant and his findings that the claimant has no gross limitations related to gross activity is supported by his

---

[6] A trigger point is a specific point or area where stimulation by touch, pain, or pressure induces a painful response. See *Trigger point*, Stedmans Medical Dictionary 706250 (2014).

[7] Palpation is examination with the hands. See *Palpation*, Stedmans Medical Dictionary 645750 (2014).

findings that the claimant had full range of motion throughout the cervical and lumbar spine with negative straight leg raising." See id. at 19.

Second, the ALJ relied on Dr. Winkler's May 17, 2016 opinion, which she submitted in response to a medical interrogatory, and which was based on her review of Parker's medical records. See id. at 19–21. Dr. Winkler concluded that Parker had mild osteoarthritis in the hips, lumbar spine, and cervical spine. See R. at 20, 992. She opined that Parker could lift and carry twenty pounds occasionally and up to ten pounds frequently. See id. at 20, 985. According to Dr. Winkler, in the course of an eight-hour workday, Parker could sit for a total of eight hours, stand for a total of six hours, and walk for a total of six hours, but that she could sit for three hours at one time without interruption, stand for one hour at a time, and walk for one hour at a time. See id. at 20, 986. Further, Dr. Winkler concluded that Parker could frequently reach, handle, finger, feel, and push/pull, with each hand. See id. at 20, 987. Additionally, when asked whether she found "sufficient credibly clinical or radiographic evidence to support the claimant's allegations of chronic and severe pain," Dr. Winkler responded, "It appears her symptoms are significantly out of proportion to any objective evidence." See id. at 20–21, 994. The ALJ gave "great weight" to Dr. Winkler's opinion, because "[her] opinion[] remains unrebutted even after the Appeals Council remand." Id. at 20.

Third, the ALJ relied on Dr. Fuchs's May 21, 2016 opinion, which, like Dr. Winkler's, was submitted in response to a medical interrogatory and was based on a review of Plaintiff's medical records. See id. Dr. Fuchs concluded that Parker could lift and carry twenty pounds occasionally and up to ten pounds continuously. See id. at 20, 995. He opined that, in the course of an eight-hour workday, she could sit for a total of eight hours, stand for a total of two hours,

and walk for a total of two hours, but that she could sit for two hours at one time without

interruption, stand for one hour at a time, and walk for one hour at a time. See id. at 20, 996.

Dr. Fuchs found that Parker could occasionally reach overhead and could continuously reach in

all other directions, handle, finger, feel, and push/pull, with each hand. See id. at 20, 997. When

asked whether he found "sufficient credibly clinical or radiographic evidence to support the

claimant's allegations of chronic and severe pain," Dr. Fuchs responded, "No!" The ALJ gave

"great weight" to Dr. Fuchs's opinion, because "[his] opinion[] remains unrebutted even after

the Appeals Council remand." Id. at 20.

Fourth, the ALJ relied on treatment notes from Parker's March 29, 2018 appointment

with spine and pain specialist Dr. Denny J. Battista. See id. at 21. At that appointment, Dr.

Battista "did not indicate complete restrictions of rotation or movement of [Parker's] neck." Id.

at 21; see also id. at 1236 (records from that appointment indicating cervical spine flexion of 90

degrees, "neutral" cervical spine extension, cervical spine right rotation of 30 degrees, and

cervical spine left rotation of 30 degrees). Further, the ALJ noted that Dr. Battista found that

Parker's neck and shoulder area did not demonstrate any muscle atrophy or loss of muscle

strength, and that there was no loss of motor strength or grip strength. See id. at 21, 1236. The

ALJ also noted, however, that Parker reported to Dr. Battista that she had neck pain radiating

up her arms; that since her last visit, her neck pain had become worse; that her pain was at a

moderate to severe level; and that the pain was "aggravated by everything and relieved by

nothing," including oxycodone she had been prescribed post-surgery. See id. at 18, 1232. The

ALJ observed that Dr. Battista recommended epidural injections for treatment of left-sided

axial neck pain. See id. at 18, 1237.

12

Fifth, the ALJ relied on treatment notes from Parker's May 3, 2018 appointment with Dr. Kairallah. See id. at 20. The "History of Present Illness" section of the medical notes state that "[f]rom an arthralgias perspective she's doing well," and that "[s]he has a little bit of pain in her hands and feet but nothing too bad." Id. at 20, 1152.

In assessing Parker's symptoms, the ALJ also concluded that various aspects of her testimony at the hearing were contradicted by medical evidence. The ALJ found that Parker's testimony that she had difficulty looking downward was inconsistent with Dr. Battista's March 29, 2018 findings regarding Parker's range of neck movement. See id. at 21. The ALJ concluded that Parker's testimony that she was bed-ridden twelve to fifteen hours per day was not credible in light of her husband's full-time work schedule and a sentence in her surgery discharge notes that the ALJ read to indicate that she was required to have assistance from her husband for only one week post-discharge. See id. at 21; see also id. at 1241 (discharge note stating, "Her husband will be available 24 hours a day throughout the next week for care."). The ALJ further noted that the only limits indicated in the discharge notes pertained to strenuous activity and heavy lifting. See id. at 21; see also id. at 1241 (discharge note stating "No heavy lifting, strenuous activity, pushing, or pulling"). Regarding Parker's claim that she wore diapers, the ALJ pointed to treatment records from an April 25, 2016 appointment with a gastroenterologist that omit mention of diapers and do not otherwise note digestive problems. See id. at 21. The ALJ discounted Parker's testimony that she uses a geriatric toothbrush, based on Dr. Battista's March 29, 2018 note that her grip strength was 5/5. See id. at 21, 1228. The ALJ also concluded that January 25, 2018 treatment notes from Dr. Daniel Mendez, indicating "mild-moderate neck pain" and noting that she was going to the YMCA and using the pool for

13

aquatherapy, undermined Parker's account of a restrictive post-surgery recovery. See id. at 21, 1224.

The ALJ found that Parker's RFC precluded her from performing her past work as a bartender, but that sufficient employment opportunities existed in the economy as a whole. See id. at 21–23. At the hearing, vocational expert Quintin Boston was posed two hypothetical sets of limitations, and asked to opine on whether a person with those limitations could perform either Parker's past work as a bartender, which is considered "light work," or other, "sedentary" work existing in the economy. See id. at 124–30. In the first hypothetical, the person could lift ten pounds occasionally, lift less than ten pounds frequently, sit for eight hours per day, stand or walk for four hours per day, never climb ladders or scaffolds, and occasionally climb stairs, stoop, kneel, crouch, or crawl. See id. at 124. Boston confirmed that such a person could not work as a bartender, due to lifting restrictions. See id. When asked if such a person could perform any sedentary work existing in the economy, Boston concluded that she could work as an "order clerk," for which there are approximately 30,000 positions in the national economy, an "addresser," for which there are approximately 15,000 positions, or a "document preparer," for which there are approximately 65,000 positions. See id. at 124–25.

In the second hypothetical, Parker's attorney asked whether sedentary work existed in the economy for someone with the additional restrictions of 30-degree cervical flexion (flexibility looking downward), and limitations in the use of her hands. See id. at 125–27. Boston responded that such a person could not perform any of the jobs he previously mentioned, due to the need to look down. See id. at 126. Boston stated, however, that such a person could work as a "surveillance systems monitor," for which there are 16,000 positions in

14

the national economy, and stated that a person in that job typically looks straight ahead at a computer screen and does not need to reach, finger, or feel. See id. at 127. But when pressed, Boston clarified that this figure was based on the assumption that the employer would offer an accommodation in the form of relief from documentation requirements, which would require use of one's hands. See id. at 128–29. He further stated that, assuming no accommodation was offered, the number of available positions would decrease by "at least ten percent." See id. at 129.

Based on Boston's response to the first hypothetical, the ALJ concluded that through the date last insured, Parker was capable of making an adjustment to other work existing in significant numbers in the national economy. See id. at 23. Accordingly, the ALJ found that Parker was not disabled during that period. See id.

On August 21, 2019, the Appeals Council declined to review the ALJ's October 12, 2018 decision, rendering it the final decision of the Commissioner. See id. at 1–4.

## III.   LEGAL STANDARD

When a district court reviews an ALJ's decision, it must determine whether the ALJ applied the correct legal standards and whether her decision is supported by substantial evidence in the record. See 42 U.S.C. § 405(g). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). A court will defer to the ALJ's decision if it is supported by substantial evidence, "even if [the court] might justifiably have reached a different result upon a *de novo* review." Sixberry v. Colvin, No. 12-CV-1231, 2013 U.S. Dist. LEXIS 134688, at *3 (N.D.N.Y. Sept. 20,

2013) (quoting <u>Valente v. Sec'y of Health & Human Servs.</u>, 733 F.2d 1037, 1041 (2d Cir. 1984)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000). A court generally should not uphold the ALJ's decision if it is based on legal error. <u>See</u> <u>Bubnis v. Apfel</u>, 150 F.3d 177, 181 (2d Cir. 1998).

## IV.    DISCUSSION

On appeal, Parker argues that the ALJ's decision was not supported by substantial evidence, because the ALJ (1) mischaracterized the nature of Parker's cervical disc disorder; (2) failed to acknowledge medical evidence in the record regarding Parker's pain, limitations in neck movement, and limitations in the use of her hands; and (3) improperly relied on expert medical opinions that were conclusory and incomplete. <u>See generally</u> Pl.'s Br.

For the reasons that follow, the Court finds that Parker's second and third arguments are meritorious. The ALJ overlooked a significant quantity of medical evidence pertinent to Parker's physical condition between her March 2016 cervical disc disorder diagnosis and her December 31, 2017 last date insured. The ALJ also did not justify the weight assigned to certain medical opinions. Moreover, in the course of reviewing the medical evidence, the ALJ at times violated regulations governing the assessment of symptoms. Below, the Court provides instructions that the ALJ is to follow in adjudicating Parker's DIB application upon remand.

### A.  The ALJ's Characterization of Parker's Cervical Disc Disorder

Parker argues that the ALJ inaccurately described her cervical disc disorder, understating its severity in a manner that led to an erroneous assessment of her RFC. <u>See</u> Pl.'s Br. at 11–12. More precisely, Parker contends that the ALJ failed to detail the complexity and

invasiveness of her May 26, 2016 surgery. See id. at 12.

This challenge is without merit. In describing Parker's surgery as a "C4 to C7 anterior cervical discectomy and fusion," the ALJ was quoting the description provided by the surgeon who conducted the procedure, Dr. Ross Moquin. See R. at 1247. This appears to be a literally accurate, succinct paraphrase of the more detailed description provided by the Appeals Council, which Parker prefers. See supra Part II(c); Pl.'s Br. at 3.

### B. The ALJ's Review of Parker's Medical Records

The Appeals Council instructed the ALJ to consider the effect of Parker's cervical disc disorder, diagnosed in March of 2016, and her spinal surgery, conducted on May 26, 2016, on her ability to work. See Pl.'s Br. at 3.The Appeals Council directed the ALJ to focus on the impact of these medical events on Parker up until her date last insured, December 31, 2017. See id. Inexplicably, the ALJ relied almost entirely on medical records from outside of this date range, despite the availability of relevant medical records during this period. On remand, the ALJ must evaluate Parker's medical records between March of 2016 and the end of 2017. Additionally, there are certain relevant aspects of the medical records from prior to this period that the ALJ must newly consider upon remand.

As Parker correctly notes, there are treatment notes from the March 2016-December 2017 period that pertain to the range of movement of her spine and neck, and pain in her neck, hands, and other areas. See Pl.'s Br. at 6, 12–13. For guidance, the Court provides the following, non-exhaustive list of relevant parts of Parker's medical records from this period that the ALJ did not mention:

(1) March 31, 2016 treatment notes from an appointment with Dr.

17

Kairallah, stating "She is being careful about ambulation because of her neck pain"; "She does not feel as if her spine is stable and it just aches all the time"; "The pain severity is 8/10"; "No point tenderness cervical, thoracic or lumbar spine limitation of range of motion of extension and rotation of the cervical spine"; "joint exam shows 8 tender joints, including MCP3, PIP2, and PIP4 of the left hand, MCP2, MCP3, and PIP3 of the right hand"; and "some scattered tenderness in the small joints of her hands." R. at 1218–20.

(2) April 20, 2016 treatment notes from an appointment with Dr. Moquin, stating "patient states having extreme pain in her neck patient states in the last 3 months lifting bilateral hands above head causes them to go numb and right arm and hand always has numbness tingling sharp pain from base of neck to the lower back down the spine more when movement of the neck"; and "patient presents neck and right arm pain." Id. at 1005–06.

(3) May 18, 2016 treatment notes from a nurse practitioner during an appointment with Dr. Moquin, stating "The level of pain on today's evaluation is 7/10, but can readily increase to 10/10, with marked decrease in range of motion of the neck, both looking up, down, and to the left and right"; and "positive for joint pain, neck, hands, and feet." Id. at 1247–48.

(3) November 16, 2016 treatment notes from an appointment with Dr. Kairallah, stating "pain severity is 7/10"; and "no point tenderness cervical, thoracic or lumbar spine, limitation of range of motion of extension and rotation of the cervical spine." Id. at 1203–05.

(4) May 22, 2017 treatment notes from an appointment with Dr. Kairallah, stating "Lately, her joints have been bothering her significantly and she is in severe pain at times especially in her hands"; "the pain severity is 7/10"; "significant limitation in all directions of the cervical and lumbar spine," "the bulk of her joint complaints are in the spine and peripheral joints with significant limitation on her spinal exam." Id. at 1185–87.

(5) June 6, 2017 treatment notes from an appointment with Dr. Kairallah, stating the same. Id. at 1180–82.

(6) November 6, 2017 treatment notes from an appointment with Dr. Mary Abdulky, stating "the pain severity is 8/10." Id. at 1163.

18

While the ALJ need not necessarily examine every bit of medical evidence in the record, the ALJ cannot disregard a significant quantity of relevant evidence supporting the claimant's position without explanation. See Anne F. v. Saul, No. 19-CV-774, 2020 WL 6882777, at *10 (N.D.N.Y. Nov. 24, 2020) ("While it is undoubtedly true that an ALJ does not have to state on the record every reason justifying a decision, and is not required to discuss every piece of evidence submitted, an ALJ also may not cherry-pick out of the record those aspects of the physicians' reports that favor [her] preferred conclusion and ignore all unfavorable aspects' without explaining [her] choices."); Brown v. Comm'r of Soc. Sec., No. 15-CV-1506, 2017 WL 2312914, at *4 (N.D.N.Y. May 26, 2017) ("[T]he ALJ . . . cannot ignore evidence supporting Plaintiff's claim while at the same time accepting evidence that supports his decision."). Horbock v. Barnhart, 210 F. Supp. 2d 125, 136 (D. Conn. 2002) ("Although the ALJ was not required to address every piece of evidence, he could not ignore the substantial evidence from plaintiff's treating physician that she had nonexertional limitations involving the use of her hands."). And to the extent that the ALJ chooses to consider medical evidence from after the date last insured, she must explain the weight assigned to notes from Parker's physical therapist in March and April 2018 appointments, in which he determined that her cervical flexion was limited to thirty degrees. See R. at 1513, 1520–21; Trank v. Saul, No. 18-CV-1002, 2020 WL 2553278, at *3 (W.D.N.Y. May 20, 2020) ("Because the Commissioner considers a physical therapist to be an 'other source', rather than an 'acceptable medical source', a physical therapist's opinion is not entitled to controlling weight. However, an ALJ is still required to weigh opinion evidence from a physical therapist, and, in rendering the disability determination, should explain the weight afforded to the opinion and why.") (citing  S.S.R. 06-03p, 2006 SSR

19

LEXIS 5); <u>Macintyre v. Comm'r of Soc. Sec.</u>, No. 17-CV-6833, 2019 U.S. Dist. LEXIS 17385, at *15–16 (W.D.N.Y. Jan. 23, 2019) (finding that the ALJ's decision was not supported by substantial evidence when he selectively mentioned unfavorable but not favorable medical evidence from after the date last insured).

As Parker correctly identifies, the ALJ additionally overlooked evidence from 2015 relevant to Parker's grip strength. <u>See</u> Pl.'s Br. at 6; R. at 1059. Treatment notes from a May 4, 2015 appointment with Dr. Kairallah indicate "weak hand grips." <u>See</u> R. at 1059. Dr. Kairallah noted the same in May 2017 treatment notes. <u>See</u> R. at 1187. That the same treating physician made this same finding twice two years apart suggests that Parker has limitations in the use of her hands. The ALJ noted only the May 2017 treatment note and, again, a treatment note from after the date last insured, in March 2018, which indicated full grip strength. <u>See id.</u> at 16, 18. The Commissioner additionally highlights a May 2016 note from a nurse practitioner the ALJ did not mention, indicating "[g]ood grip strength bilaterally." <u>See</u> Def.'s Br. at 8.

The Commissioner argues that overlooking the May 2015 treatment note would not change the analysis, because an impairment and its resulting limitations must last for a continuous twelve months for a claimant to qualify as disabled, and the nurse practitioner's note suggests intermittent grip strength weakness between May 2015 and May 2017. <u>See</u> Def.'s Br. at 9 ("[P]laintiff's argument must fail . . . in light of the sporadic nature of the grip weakness[.]") (citing <u>Barnhart v. Walton</u>, 535 U.S. 212, 222–223 (2002) ("[T]he statute's 12 month duration requirements apply to both the impairment and the inability to work requirements.") (internal quotation marks omitted)); <u>see also</u> 42 U.S.C. § 423(d)(1)(A) (defining "disability" as "inability to engage in any substantial gainful activity by reason of any

20

medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months"). It is improper for the Commissioner to offer this post-hoc rationalization in a brief on appeal. See Macintyre, 2019 U.S. Dist. LEXIS 17385, at *19 ("[N]one of the rationalizations advanced by Defendant are present in the ALJ's written determination, and Defendant's after-the-fact explanation as to why the ALJ properly rejected Dr. Deiss's opinion cannot serve as a substitute for the ALJ's findings.").

In any case, the Commissioner's argument is without merit, for two reasons. First, courts have not interpreted the twelve-month requirement to categorically deny benefits to people whose symptoms wax and wane over a period of at least twelve months. See Anne F., 2020 WL 6882777, at * 10 ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days . . . Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.") (quoting Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008)).[8] Second, while this nurse practitioner's May 2016 note would be appropriate to consider, it would not necessarily override the May 2015 and May 2017 determinations of Dr. Kairrallah, to the extent that they conflict. See Wicks v. Saul, No. 19-CV-171, 2020 U.S. Dist. LEXIS 174042, at *7–8 (W.D.N.Y. Sep. 21, 2020) ("[Nurse practitioners] are included among the 'other sources,' whose opinion may be considered as to the severity of the claimant's impairment and ability to work. While an 'other source' opinion is

---

[8]   While it is for the ALJ to assess this factual question in the first instance, the Court notes that there is some suggestion in the record that Parker's limitations in the use of her hands are intermittent. See, e.g., R. at 744 (note from August 5, 2015 appointment with Dr. Dodji Madjinou stating that Parker "intermittently gets pain in her hands").

not treated with the same deference as a treating physician's opinion, the assessment is still

entitled to consideration, especially when there is a treatment relationship with the claimant.")

(internal citations omitted).

Before remanding this case, the Court must determine whether the ALJ's failure to

assess the relevant evidence mentioned was harmless error. See, e.g., McIntyre v. Colvin, 758

F.3d 146, 148 (2d Cir. 2014) (noting that harmless error analysis applies to challenges to an

ALJ's decision in a Social Security context); Cheeseman v. Berryhill, No. 16-CV-273, 2018

WL 1033226, at *11 n.5 (D. Vt. Feb. 23, 2018) (noting that "[d]istrict courts in the Second

Circuit have come to the same conclusion," and collecting cases). "An error is harmless 'where

application of the correct legal principles to the record could lead only to the same

conclusion.'" Jessica R. v. Berryhill, No. 17-CV-236, 2019 WL 1379875, at *8 (D. Vt. Mar. 27,

2019) (alterations omitted) (quoting Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010)).

Failing to review medical records from the relevant time period was not harmless error,

because this failure affected the instructions given to the vocational expert. Among other

relevant potential omissions, the ALJ did not mention in the hypothetical she posed to Boston

any limitations in Parker's use of her hands. See id. at 24. In the second hypothetical, this

addition prompted Boston to postulate the existence of one occupation Parker could perform, at

16,000 total positions in the economy rather than over 100,000. See id. at 124–25, 127.

The Government argues that failure to mention hand-related limitations would be

harmless error at worst, citing cases holding that demonstrating the existence of 16,000 jobs in

the economy is sufficient for the Commissioner to meet his burden. See Def.'s Br. at 10. But

when further questioned, Boston revealed that the 16,000 figure was based on an assumption

that employers would make reasonable accommodations, as required under the Americans With Disabilities Act; and he did not provide a precise number of jobs available without accommodation. See id. at 128–29.

Boston's answer was based on a legally impermissible premise, and thus does not provide useful guidance. The Social Security Act requires no determinations about reasonable accommodation in order to ascertain whether an individual is disabled and entitled to benefits. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 803 (1999) ("[W]hen the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI.") (emphasis omitted). Indeed, SSA policy prohibits consideration of whether a claimant can perform "other work that exists in significant numbers in the national economy . . . with accommodations, even if an employer would be required to provide reasonable accommodations under the [ADA]." SSR 11-2p, 2011 SSR LEXIS 2 at *19; see also West v. Comm'r of Soc. Sec., No. 16-CV-2333, 2018 WL 2221673, at *5 (D. Or. May 15, 2018). Accordingly, if the ALJ finds that Parker's limitations are different than the ALJ earlier concluded, the ALJ must newly present a hypothetical to a vocational expert that captures Parker's limitations.

### C. The ALJ's Assessment of Medical Opinions from Puri, Winkler, and Fuchs

The ALJ assigned significant weight to the opinions of two government medical experts, Dr. Winkler and Dr. Fuchs, who reviewed Parker's medical records shortly before her surgery, and some weight to the opinion of Dr. Puri, who examined Parker two years prior. The ALJ failed to justify the weight she assigned to these opinions.

23

For reasons that need not be explained at length, the opinions of Dr. Winkler and Dr. Fuchs are of no value in determining the physical effects of a surgery that occurred after they wrote their opinions. See Charles M. v. Berryhill, No. 18-CV-92, 2019 WL 3886901, at *10 (D. Vt. Aug. 19, 2019) ("Because Dr. Abramson did not review all of Plaintiff's relevant medical information, her opinion is not supported by evidence of record as required to override the opinion of a treating physician.") (internal quotation marks omitted); Mead v. Colvin, No. 13-CV-71, 2014 WL 1165836, at *8 (D. Vt. Mar. 21, 2014) (finding ALJ erred by assigning significant weight to the opinion of an agency consultant who neither examined plaintiff nor considered medical opinions submitted after her review of the plaintiff's claim). And Dr. Puri examined Parker long before the underlying cervical conditioning necessitating surgery was diagnosed.

Additionally, insofar as Dr. Winkler and Dr. Fuchs's opinions are relevant to ascertaining the impact of Parker's cervical spine disorder prior to surgery, they arguably do not deserve significant weight. This is so, first, because around the time that these government medical experts rendered their armchair opinions based on a review of Parker's medical records, doctors who actually examined Parker determined that her pain was real and justified a surgical procedure on her spine. See R. 1007, 1220, 1241, 1247; see also Pl.'s Br. at 13–14 ("Here a board-certified neurosurgeon, relying upon the results of an MRI and his own examination observations, performed invasive and complicated surgery to address the plaintiff's allegations of pain and numbness."). While the weighing of evidence is the province of the ALJ, the ALJ cannot ignore this elephant in the medical records, or contradict the medical conclusion of a treating source without acknowledging its evidentiary significance. See

Gough v. Saul, 799 F. App'x 12, 15 (2d Cir. 2020) ("While we agree with the district court that it is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such, here the ALJ did not explain how the evidence conflicted, nor did the ALJ explain how he purported to resolve that conflict.") (internal quotation marks, citations, and alterations omitted).

Moreover, upon close inspection, the opinions of Dr. Winkler and Dr. Fuchs are strikingly conclusory. Both were asked the following question: "In your view of the medical record . . . do you find sufficient credible clinical or radiographic evidence to support the claimant's allegations of chronic and severe pain in her skull, spine, shoulders, knuckles and right heel and ankle bones?" R. at 994, 1004. Dr. Winkler responded, "It appears her symptoms are significantly out of proportion to any objective evidence," without providing any reasoning, and, ironically, *without citing any objective medical evidence.* See id. at 994. Dr. Fuchs, in a manner both colorful and uninformative, replied, "No!" See id. at 1004. While the ALJ is permitted the discretion to assign weight to medical opinions, within certain bounds, the Court is skeptical that these ones have much value and will scrutinize the reasoning of any subsequent decision that relies upon them. See, e.g., Curry, 209 F.3d at 123 (finding error in ALJ's reliance on a conclusory medical opinion describing claimant's functional capacity in demonstrating that the claimant could perform certain exertional requirements); Villanueva v. Barnhart, No. 03-CV-9021, 2004 U.S. Dist. LEXIS 26243, at *27–29 (S.D.N.Y. Dec. 31, 2004) (same).

Failure to justify the weight accorded to Dr. Winkler and Dr. Fuchs's opinions was not harmless error, because their characterizations of Parker's limitations informed the hypothetical posed to Boston. See R. at 124–25.

### D.  The ALJ's Assessment of Symptoms

Parker's claim to be disabled depends in part on her subjective descriptions of physical pain and other symptoms, both in her appointments with medical professionals and in her testimony before the ALJ. Parker contends that the ALJ discounted much of Parker's subjective evidence without adequate explanation. See Pl.'s Br. at 13–14. The SSA advises that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," SSR 16-3p, 2016 SSR LEXIS 4, at *10–11, and that an ALJ shall "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual, " id. at *12–13. Moreover, to the extent that an ALJ uses objective medical evidence to undermine the claimant's subjective accounts of symptoms, the ALJ is "required . . . to 'explain which of an individual's symptoms [the ALJ] found consistent or inconsistent with the evidence in [the claimant's] record and how [the ALJ's] evaluation of the individual's symptoms led to [the ALJ's] conclusions." Wagner v. Saul, No. 18-CV-195, 2019 WL 3955421, at *4 (W.D.N.Y. Aug. 22, 2019) (quoting SSR 16-3p, 2016 SSR LEXIS 4, at *21). Notwithstanding this guidance, the ALJ discounted Parker's subjective accounts of pain and other symptoms in some instances based merely on the absence of objective medical evidence, and in other instances on the basis of spurious assertions of conflicts with the objective medical evidence.

In addressing Parker's subjective accounts of pain and other symptoms, the ALJ remarks, "Despite repeated diagnoses and treatment, there continues to be no credible evidence in support of the claimant's allegations regarding the nature and extent of her limitations." R. at

26

20. As support, the ALJ cites thirty exhibits worth of medical records, spanning from 2013 to 2018. Id. The implication appears to be that there is an absence of objective evidence in the record as a whole. But this mode of reasoning directly contravenes SSR 16-3p. Moreover, as discussed, Parker's medical records from the relevant time period contain numerous references to subjective complaints of pain and other symptoms, which the ALJ cannot ignore.

The ALJ additionally relies upon the determinations of Dr. Winkler and Dr. Fuchs that the Court earlier determined to be conclusory. See R. at 20–21; *supra* Part IV(c). The question these experts were posed seems to assume the same legally erroneous premise that Parker had the burden to present objective medical evidence to support her account of the intensity, persistence, and limiting effects of her pain. See R. at 994, 1004 ("[D]o you find sufficient credible clinical or radiographic evidence to support the claimant's allegations of chronic and severe pain in her skull, spine, shoulders, knuckles and right heel and ankle bones?"). Simple "no" answers to this question, without citations to specific parts of the medical record that conflict with Parker's account, do not justify discounting Parker's reported symptoms.

The ALJ also discounted much of Parker's testimony at the hearing. While the ALJ's reasoning is defensible at parts, the following aspects of her reasoning are not justifiable to an extent that a "reasonable mind might accept." Shaw, 221 F.3d at 131. First, the ALJ discounted Parker's testimony that she is bedridden 12-15 hours per day, and that her husband must empty her commode and make her food, by pointing to a note in her hospital release record stating "Her husband will be available 24 hours a day[] throughout the next week for care." See R. at 21, 1241. The ALJ notes that Parker's "husband works full time and at the time of her discharge from the hospital after the discectomy, she was required to have assistance for one week only."

27

See id. at 21. But Parker represented in her testimony that her husband assisted her before and after work. See id. at 107–13. And the hospital discharge note does not appear to provide that his assistance was recommended for only one week, but rather that he as a matter of fact would be available full-time for that period. See id. at 1241. Elsewhere, the ALJ discounts Parker's claim that she had to wear diapers, based on treatment notes from an appointment with a gastroenterologist in which this was not mentioned. See id. at 21, 1101. But that appointment was on April 25, 2016, before her surgery. See id. at 1101, and Parker was testifying exclusively to her experience after the surgery, see id. at 106. Moreover, by Parker's account, she wore a diaper not due to gastrointestinal issues, but due to the difficulty of climbing stairs to reach her second-floor bathroom. See id. at 113. In discounting Parker's general account of a restrictive post-surgery recovery, the ALJ cites January 2018 treatment notes indicating that she was participating in aqua therapy. See id. at 21. But as discussed, the ALJ ignored treatment notes for the eighteen months preceding January 2018, which are at least as relevant.

On remand, to the extent that the ALJ contradicts Parker's subjective account of pain and other symptoms, the ALJ must cite to specific parts of the record—during the relevant time period, where warranted—that undermine Parker's representations. Where such contradictions are absent, the ALJ must credit Parker's subjective account.

## V.     REMAND INSTRUCTIONS

Because the ALJ's decision is not supported by substantial evidence, and because the ALJ made legal errors in the course of assessing Parker's symptoms, the Court remands this action. The Court specifies the following requirements and offers an optional recommendation.

The Court begins with the requirements. First, the ALJ must acknowledge and account

for relevant medical evidence from between the March 2016 cervical disc disorder diagnosis and the December 31, 2017 date last insured. Second, the ALJ also <u>must</u> acknowledge evidence prior to the March 2016 diagnosis that is relevant to Plaintiff's claimed impairments, including but not limited to Dr. Kairallah's May 4, 2015 treatment notes indicating "weak hand grips." <u>See</u> R. at 1059. Third, in assigning weight to the May 2016 opinions of Dr. Winkler and Dr. Fuchs regarding Parker's alleged symptoms, the ALJ <u>must</u> account for contrary medical evidence, including but not limited to records relating to her diagnosis with cervical disc disorder and her subsequent surgery. Fourth, the ALJ <u>must</u> accord weight to Parker's subjective evidence in a manner faithful to the governing regulatory standards. <u>See</u> *supra* Part IV(D).

Fifth, because there are no expert opinions rendered after May 21, 2016 regarding Parker's work-related limitations, the ALJ <u>must</u> obtain expert assistance at least in reviewing records after that date. <u>See</u> <u>Wilson v. Colvin</u>, No. 13-CV-6286, 2015 WL 1003933, at *21 (W.D.N.Y. Mar. 6, 2015) ("[W]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities, the general rule is that the Commissioner may not make the connection himself.") (internal quotation marks omitted); <u>Holt v. Colvin</u>, No. 16-CV-01971, 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) ("An ALJ cannot determine the RFC solely 'on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.'") (quoting <u>Guarino v. Colvin</u>, 14-CV-598, 2016 WL 690818, at *2 (W.D.N.Y. Feb. 22, 2016)). The opinion of a treating source would be preferable, although not required, as long the ALJ's decision is

otherwise sufficiently supported.[9] Wright v. Berryhill, No. 16-CV-6156, 2017 WL 2720004, at

*3–4 (W.D.N.Y. June 23, 2017) ("Many courts in this circuit have held that the ALJ has a duty

to develop the record to obtain an opinion from a treating source whenever possible . . .The

Second Circuit has indicated, however, that an ALJ's failure to obtain such a report does not

necessarily require remand where the record otherwise contains sufficient information about the

claimant's residual functional capacity."); see also Tankisi v. Comm'r of Soc. Sec., 521

Fed.Appx. 29, 34 (2d Cir. 2013) ("[R]emand is not always required when an ALJ fails in his

duty to request opinions, particularly where, as here, the record contains sufficient evidence

from which an ALJ can assess the petitioner's residual functional capacity.").

The Court also recommends that the ALJ consider assigning an onset date different

from the one alleged. The ALJ has the authority to do so. See SSR 83-20, 1983 SSR LEXIS 25,

at *6 ("In determining the date of onset of disability, the date alleged by the individual should

be used if it is consistent with all the evidence available. When the medical or work evidence is

not consistent with the allegation, additional development may be needed to reconcile the

discrepancy."); Lockwood v. Colvin, No. 12-CV-0973-A, 2014 WL 3894494, at *10

(W.D.N.Y. Aug. 8, 2014) ("In addition to determining that an individual is disabled, the

Commissioner must also establish the onset date of disability."), report and recommendation

adopted, No. 12-CV-973, 2014 WL 4996429 (W.D.N.Y. Oct. 7, 2014). The Court reaches no

conclusion as to whether Parker has been disabled since June 12, 2013. But the Court notes that

Parker evidently developed a severe impairment involving her cervical spine at some point not

long before her March 2016 diagnosis, and underwent a significant surgery in May 2016 that

---

[9] The Court notes that Dr. Kairallah treated Parker for most of the relevant time period.

common sense indicates had some physical effects. Additionally, evidence of pain and weakness in her hands arguably emerges most clearly in 2015. The ALJ is not confined to a choice between a finding of disability beginning on June 12, 2013 and a finding of no disability at any time; and the ALJ should consider the third option of finding Parker disabled starting at a later onset date. See, e.g., Rose v. Astrue, No. 06-CV-1885, 2008 U.S. Dist. LEXIS 6229, at *60 (D. Ariz. Jan. 26, 2008) (noting in remand instructions that "[i]n the event Plaintiff is determined to be under a disability, the ALJ may have to change the onset date"). In analogous circumstances, ALJs have unilaterally assigned later onset dates than alleged. See, e.g., Lockwood, 2014 WL 3894494, at *11 (affirming ALJ's selection of an onset three years later than alleged, because "substantial evidence indicates that the time around August 1, 2007 was a time of significant change in Lockwood's medical history").

## VI.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's decision denying Plaintiff's application for DIB is **VACATED**, and this case is **REMANDED** to the Commissioner for further administrative proceedings consistent with this order; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      February 19, 2021
            Albany, New York

Lawrence E. Kahn
U.S. District Judge

31